H. K. McCANN CO., INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 6578.    Promulgated November 15, 1928.

*Harold Dudley Greeley*, Esq., *A. E. Graupner*, Esq., and *Fred V. Delavina*, Esq., for the petitioner.

*George G. Witter*, Esq., for the respondent.

242

OPINION.

Phillips: Petitioner filed its income-tax return for the calendar year 1918 and claimed classification as a personal service corporation within section 200 of the Revenue Act of 1918. The respondent denied personal service classification and determined the deficiency here in question.

Section 200 of the Revenue Act of 1918 defines a personal service corporation as follows:

> The term "personal service corporation" means a corporation whose income is to be ascribed primarily to the activities of the principal owners or stockholders who are themselves regularly engaged in the active conduct of the affairs of the corporation and in which capital (whether invested or borrowed) is not a material income-producing factor; but does not include any foreign corporation, nor any corporation 50 per centum or more of whose gross income consists either (1) of gains, profits or income derived from trading as a principal, or (2) of gains, profits, commissions, or other income, derived from a Government contract or contracts made between April 6, 1917, and November 11, 1918, both dates inclusive.

Section 218 of the Revenue Act of 1918 provides for the taxation of the income of a personal service corporation in the following manner:

> Personal service corporations shall not be subject to taxation under this title, but the individual stockholders thereof shall be taxed in the same manner as the members of partnerships. All the provisions of this title relating to partnerships and the members thereof shall so far as practicable apply to personal service corporations and the stockholders thereof: *Provided,* That for the purpose of this subdivision amounts distributed by a personal service corporation during its taxable year shall be accounted for by the distributees; and any portion of the net income remaining undistributed at the close of its taxable year shall be accounted for by the stockholders of such corporation at the close of its taxable year in proportion to their respective shares.

Petitioner was not a foreign corporation, nor was 50 per centum or more of its gross income derived from trading as a principal or

from gains, profits, commissions or other income derived from Government contracts. The principal stockholders were regularly engaged in the active conduct of the affairs of the corporation. It remains then to determine (1) whether its income is to be ascribed primarily to the activities of the principal stockholders and (2) whether capital, invested or borrowed, was a material income-producing factor.

Petitioner was engaged during the taxable year in rendering service as an advertising agent. These services consisted in the giving of expert advertising counsel and advice to advertisers whom it designated as clients; the investigation and study of the manufacturing, marketing and advertising situation of its clients; the drafting of a comprehensive advertising plan to meet the needs of its clients; the selection of the advertising media; the preparation of special advertising and the execution in detail of the advertising plan; the checking of advertising results and making changes, when necessary, in the plan of advertising during the progress of a campaign.

Its income was derived from commissions on advertising placed in publications, and fees for service. The commissions, usually 15 per cent, were based on the cost of work which petitioner performed for its clients or had executed for them by outside parties under its direction or supervision, such as art work, engraving, electrotyping and miscellaneous production work. Service fees were charged for special work such as the preparation of booklets, folders, signs, and miscellaneous advertising matter, or where the amount expended for advertising was small in proportion to the work required of petitioner. There were also certain minor items of income not material in determining this issue.

Petitioner's original stockholders had been associated in the advertising department of the Standard Oil Co., and upon dissolution of that company in 1911, petitioner was organized to take over the advertising of the subsidiary Standard Oil companies. Approximately 50 per cent of its business was received from these Standard Oil companies and substantially all of the balance from a few large advertisers who had been procured by the stockholders of petitioner. In 1919 petitioner's principal stockholders, who were actively and regularly engaged in its business, were expert advertising men of many years' experience in the advertising business, and included four of its five original stockholders.

The evidence establishes that what the advertisers sought was the expert advertising advice and marketing counsel of petitioner's stockholders. They were all trained advertising men. Their judgment as to the market to be reached and the best means of reach-

ing that market was the foundation of all advertising service rendered by petitioner. Counsel and advice on all matters relating to advertising and marketing problems were given by the stockholders. The number of clients was so small and the amount expended by each was so substantial that it was possible for the stockholders to give their personal attention to the problems of these advertisers. They procured all of petitioner's clients, surveyed their advertising and marketing situation, formulated the basic plans of advertising, prepared estimates of its cost, and directed and supervised the execution of these plans by petitioner's organization. They advised as to the type of advertising to be used, whether magazine, newspaper, bill board, street-car cards, pamphlets, or booklets. They advised as to the particular publications or type of publication most likely to reach the prospective purchaser of the articles to be advertised, as to the article to be advertised in various types of publications and the nature of the advertising to be followed. They made recommendations as to the field in which in their judgment, the articles to be sold could be most advantageously advertised. They prepared budgets for their clients, which stated the amount which they believed could be advantageously expended in advertising and showed the method in which they proposed the amount be expended. They followed up the results of the advertising and recommended such changes, either in the publications used, the field covered or the type of advertising, as seemed desirable. They supervised the preparation of the advertisements and frequently prepared such advertisements themselves. Details were performed by employees under the supervision of the stockholders. These employees assisted in the preparation of the advertisements, sent them on to the various publications for insertion, checked the publications to see that advertisements were inserted as ordered and that bills rendered were correct, attended to the necessary bookkeeping and correspondence, kept records as to the various publications, their circulation, rates, field covered, and other such matters. The number of the employees was large. The duties performed by all have been explained. In this respect, this proceeding differs from *Patterson-Andress Co.*, 6 B. T. A. 392.

We have no doubt that there is a point beyond which the services of employees may not be used without creating an organization which overshadows its supervisors in producing income, or so materially assists that income can no longer be said to be produced primarily by those who originate the business and supervise its execution. Whether that point has been reached must be decided in each case upon the facts in such case. In a business such as that conducted by the petitioner, the decision must turn upon the duties

performed by the employees rather than upon their number or the salaries paid to them. Where, as here, employees function only under the direction of the stockholders who are the active creative force in the business and whose judgment and planning are the foundation of the service rendered; where the service for each client is performed according to an original plan created by the stockholders who give their personal attention to the carrying out of the service, the presence of employees who assist in the execution of the plan does not negative the primary function of the stockholders in the production of income. *Westerman & Pagano, Inc.*, 2 B. T. A. 1308; *Moser & Wacker, Inc.*, 4 B. T. A. 1021; *S. A. Conover Co.*, 6 B. T. A. 679; *Fuller & Smith* v. *Routzahn*, 23 Fed. (2d) 959.

We have already pointed out that substantially all of petitioner's work was done for a few large advertisers, all of whom had been procured by the stockholders. These clients were primarily interested in securing the personal advice and attention of these stockholders and the situation was such that the stockholders were able to give detailed personal attention to the advertising of each client; something which might not be possible in the case of an agency handling a great number of small accounts.

In our discussion above we have considered Ellis as a stockholder. Technically he was not until December 27, 1918. Until then all he had was an executory agreement with McCann for the acquisition of stock. Before the year expired his stock had been paid for and he was the owner of record. The accounts which he handled contributed about 11 per centum of petitioner's gross income. Some of this came from accounts formerly handled by McCann and it appears that McCann consulted and advised with Ellis concerning the service rendered from the Cleveland branch. It would be contrary to the spirit, if not to the letter of the statute, to deny personal service classification on the basis of this situation.

We come then to consider whether capital was a material income-producing factor. The balance sheets at the beginning and end of the year are set out in the findings and are apparently submitted as representative of the situation throughout the year. At the beginning of the year assets of $375,988.59 are shown, $90,000 of this amount represents so-called contract rights; the letters from the Standard Oil companies authorizing McCann to serve as their advertising agent. These were terminable at will and the continuance of the relationship depended not upon these letters but upon satisfactory service. We do not conceive that in 1918 these letters were a material income-producing factor. We also eliminate from further consideration loans and advances and investments set out in the balance sheets at the beginning and at the end of the year. While

some small income may have resulted from the Briggs mortgage and the Liberty bonds, it was certainly not a material part of the whole. The use of capital for furniture and fixtures in such a business as that conducted by the petitioner is necessary, but is only incidental to the production of income. The same is true of so much as may be necessary to pay current expenses.

The use of capital to pay accounts of craftsmen and publishers was relied upon by the respondent as one ground for denying personal service classification. At the beginning of the year the books showed $199,149.68 charged to clients and $5,777.23 paid to craftsmen but not charged to clients. At the end of the year these amounts were respectively $140,616.60 and $26,634.99.

All of the amount charged to clients did not represent advances to publishers and craftsmen for their account. Approximately 15 per cent represented commissions. How much of the balance had been paid to publishers can not be determined, for the amounts shown in the liabilities as payable to publishers, $24,579.24 on January 1, and $22,997.66 on December 31, are inaccurate because of the system of bookkeeping employed. It was customary to draw checks to publishers before the dates when they would be mailed. They were posted in the cash account and in the accounts payable as of the date when drawn, and not as of the date when mailed or when paid at the bank. The result is that both the amount of cash in bank, on the asset side of the balance sheet, and the amount of accounts payable to publishers, on the liability side, are understated. How the accounts payable to publishers would correspond with the accounts receivable from clients is not known. It is clear, however, that payments were sometimes made to craftsmen and publishers before payment was received from advertisers, although this was not the usual procedure. Petitioner endeavored to send statements to its clients in such a manner that payment would be made to it before it made payment to the publisher. It was the custom to make payment to the publishers within the cash discount date, whether or not payment had been received from clients. All cash discounts were passed on to the clients and no such discounts were retained by the petitioner.

The total advertising placed through petitioner during 1918 was over $2,750,000. There is nothing which would lead us to believe that the amount paid to publishers or craftsmen in advance of payment by the client ever exceeded $100,000 at any one time in 1918, and much which would indicate that the average was substantially less. It would appear that by a change in its routine petitioner might have operated its business in such a manner as to have paid

publishers only after payment had been made to it, without decreasing its income. The bulk of petitioner's business came from large corporations which had no need to rely upon any credit which the petitioner could have extended to them. We are satisfied that neither the business nor the income of the petitioner were obtained because of the use of capital or credit and that capital was not a material income-producing factor. *Bryant & Stratton Commercial School, Inc.*, 1 B. T. A. 32; *Winthrop Ames*, 1 B. T. A. 63; *S. A. Conover Co.*, *supra; Lee Live Stock Commission Co.*, 7 B. T. A. 532; *Innes-Behney Optical Co.*, 7 B. T. A. 982; *Fuller & Smith* v. *Routzahn*, *supra; Armstrong* v. *McCaughn*, 21 Fed. (2d) 637.

We conclude that the petitioner was a personal service corporation in 1918 and that its income is to be taxed to its stockholders rather than to the corporation. There is no deficiency.

Reviewed by the Board.

*Decision will be entered accordingly.*

*Harold Dudley Greeley, Esq., A. E. Graupner, Esq.,* and *Fred V. Delavina, Esq.,* for the petitioner.

*George G. Witter, Esq.,* for the respondent.